The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oye, oye, oye. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to give their attention to the Court of Nothing. God save the United States and His Honorable Court. Good morning, Counsel. Good morning, Your Honor. We're happy to hear your argument in our first case. And if you would identify yourselves just so that we're sure exactly who you are when you speak. I think we're ready to begin, Counsel. Very good. Thank you. Good morning, Your Honors. My name is Susan Baker Manning of Morgan Lewis. May it be a pleasure to serve as your attorney. I would like to begin by acknowledging that Mr. Arevalo-Quintero, this morning, the BIA erroneously affirmed an order to remove Mr. Arevalo on the sole ground that a particular social group based on current gang membership is not cognizable. And the government invites this court to err by doing the same. That neither the BIA nor the IJ have ever addressed the merits of Mr. Arevalo's actual withholding claim. And the BIA decision under review is wrong on both the law and the facts. If I may, I'd like to focus on three particular forms of error in the BIA's 2019 decision. First, the BIA erred in finding that Mr. Arevalo attempted to assert a new particular social group on appeal. To the contrary, the record is quite clear that Mr. Arevalo tied his fear of persecution to his status as a former gang member. And the record also indicates that he tied his fears to his cousin who had been brutally murdered by the gang. And if... What is the, excuse me, Counsel, what's the evidence with respect to the cousin? The evidence with respect to that it was raised or... And that it is a viable social group. Well, several things on that, Your Honor. With respect to whether Mr. Arevalo put the IJ on appropriate notice that his claim related to his cousin, if you look at the application form itself, you know, we have these very small boxes and there's not a lot of room to write in there. But what Mr. Arevalo devoted, I would say probably the majority of the text he put there too, was discussion of his cousin and referencing how his cousin had been murdered for leaving the gang. During his testimony, he was asked why he feared being harmed if he was returned to El Salvador. The first thing he answered was a statement that he had been So he's tied, so he is certainly, I think it's probably fair to say he is spending more of his time talking about his fear of being murdered by the gang as punishment for leaving them. He is repeatedly and consistently also tying his fear to his relationship to his cousin. And in terms of whether family is a viable particular social group, you know, that... There's a number of cases that have recognized that a family is a potentially viable social group. Obviously, it has to satisfy all of the basic requirements, and it's not an issue that the BIA or the IJ have ever addressed in this case, and it would be appropriate for them to do so on remand. Ms. Manning, I take it, at least the way I read the record, is that there should be a claim that the IJ failed to fulfill her duty to develop the record. And I take it by your answer that you agree. What does that duty look like in practice? In other words, what would we tell an IJ if we were to send the case back, this is what you need to do? Well, I'll use this case as an example. You know, if this case is remanded to the immigration judge, what she will need to do is to genuinely explore what Mr. Aravello's particular social group is. In this case, he was simply never asked what his particular social group is, and I'm not suggesting that it would be sufficient to ask a pro se applicant, you know, Mr. Aravello, what is your particular social group? Because that sort of legal term of art is not fair game to put in those stark terms to a pro se applicant. Well, wouldn't that be somewhat differentiating if we sent it back? I'm assuming you're representing him on appeal. I don't know what would happen if he goes back, but he was pro se the first time when he goes up. And so Judge Flores' question goes to really, in this circuit, what is the duty of the IJ to develop the record? That's the fundamental question here, because if you look at the record just in and of itself, I'm not sure he ever articulates what this group is. And he's limited in English. So that's kind of from your perspective. But the question that we face is, you know, what is his duty and what does it look like? Now, in terms of when it goes back, if he's represented, then the question comes is, is that a different type of situation? Someone who's pro se as opposed to being represented that the IJ in terms of the duty of the IJ. So those are the questions we have to grapple with, I think, in this appeal, at least initially. I understood, Your Honor, and I think that's right. And I know you have another case that touches on these issues as well. I think that here, once... Yours doesn't just touch on it. Your case is on all fours with it. This is not a touch on issue type thing, but what I can see. So that's why I'm asking you to articulate at least that here. Sure. Fair enough, Your Honor. So I think when the case goes back, the immigration judge has a duty to develop the record. The BIA has clearly said that in a matter of JFF, among other places. I think that in practical terms, what it means is that when a pro se applicant comes in, testifies about the nature and source of his or her fear of future persecution, they need to, the IJ needs to come in and ask questions. Who exactly are you afraid of? Why are you afraid of them? Why are they going to hurt you? Is anybody else going to hurt you? That last is, it's called a deposition 101. You know, you need to ask all the questions to make sure you've got a complete record. Well, counsel, I think that goes to what's underlying my colleagues' questions. Does the IJ have a responsibility to help the pro se litigant? Is that what you're saying? I don't think the IJ has a duty to help the pro se litigant. You know, there's some concern that the IJ is somehow conscripted as an advocate, and that is absolutely not what we are suggesting. The IJ simply has to get the facts out on the record. And asking things like, why are you afraid? Who exactly are you afraid of? In other words, does he have to help the applicant make the best possible case by getting these things out? Is that the standard? What we're looking for is how we would instruct the IJ. Sure. I think what the IJ has to do is, anytime there is enough information to sort of put the IJ on fair notice. Again, we're talking about, you know, there are only two immigration law experts in the room, the IJ and the DHS attorney. If there is something factually that the applicant puts forward that's sufficient to suggest a particular social group, and I don't mean, you know, turn it upside down, you know, and, you know, squint at it. But if it really is there on the record, the IJ should be asking the questions, what they're afraid of, why they're afraid of it. Ask questions that get at immutability, particularity, social distinction. The IJ should go through all of those steps, not to help the applicant, but simply to make sure that the information is there on the record, from which the BIA and ultimately this court on appeal can make the legal determinations about whether, you know, there is or is not a viable claim. But that appellate review goes nowhere unless the IJ makes that record. And I do think the duty is enhanced somewhat in cases involving a pro se applicant. Let me ask you about that, because I don't know, how many of these immigration cases have you done? A decent number, certainly not as many as others, but a decent number. Well, we see a decent number, too, and I would say that the representation is often not of the quality that you are giving this person. And so do we make a more, do we give the pro se person more benefit? And if you have a lawyer, the IJ doesn't have this responsibility? Because that would seem to me to be really, on the whole, bad for applicants. No, I think that's right. And again, the BIA has noted that the immigration judge has a general duty to make sure the record is clear and that all of the issues are touched upon, both in the record and in their opinion. And your sister circuits, you know, the Second Circuit, the Ninth Circuit, I believe the Eighth Circuit, all of them have talked about an enhanced duty as to pro se applicants. But that is not, I don't think that's some sort of bright line. I think that the duty is there to get it on the record. And to the extent that a pro se applicant simply requires a little bit more work to discharge that basic duty to ensure that the record is fulsome enough so that we can analyze these issues on appeal, to the extent that a pro se applicant necessarily requires a little bit more, then they do. But that's just the nature of the situation. What creates this duty? Is it statutory or constitutional? BIA, I believe, regards it as part and parcel of their statutory obligations. What are you saying to us? I'm saying that I think the BIA is right. I do think that it is part of the sort of general duty to ensure that eligible applicants are, in fact, granted asylum, withholding, or CAT as appropriate. You know, the purpose of the immigration system and the immigration judge, the BIA, it's not their job to weed people out, of course. It is their job to determine who is and who is not properly eligible for protection based on the law. Judge Motz's question is fundamentally necessary for us to decide. What essentially we are asking is, is this a due process violation? Some of the circuits, or a lot of the circuits have held that. Or is it, as you seem to want to say, it's a legal error? That, you know, maybe the difference is not that great, but at least the question is whether it's a constitutional one, a constitutional approach, or is it simply a legal error in terms of the duty to develop this record? So the question is, how do you characterize this violation by the IJ to not develop the record? I believe it is a failure in the IJ's statutory duties. I think your Honor is also correct in that there are certainly due process issues here. We haven't made a due process claim per se. I think we've touched this more in terms of the IJ. I'm not saying that due process, you know, in making that decision. I'm simply saying there are a number of circuits that have held that. And my question is, how do you analyze this and what is this violation? If there is a violation, a duty to do it, then what is it? So I do think that your Honor is correct. There are a number of circuits that have analyzed this in a due process lens, and I certainly think that is correct. There is a duty to ensure that the applicant, even a pro se applicant, who is unaware of the relevant legal tests, any of the legal ease, any of these issues, that they at least have the opportunity to present evidence that would touch on all of the relevant elements of the claim. In other words, they're simply asked the question. All the IJ has to do is ask the basic questions that should elicit the relevant information. You're never going to get a pro se applicant who says, well, Madam Immigration Judge, my particular social group is blank, blank, blank, blank, blank. That's not going to happen, and of course, not what anyone would expect. But as long as the Immigration Judge solicits the relevant information by just asking the questions that touch on the relevant points, then I think the Immigration Judge will at least have fulfilled their minimum duty. Ms. Manning, what we should do, would it be akin to how we handle pro se litigants, for example, in pleadings? We give them, there's not as high a burden on them for pleading purposes. Is that something that we should look at? Exactly so, Your Honor. In both the Article III courts and before agencies and these kinds of proceedings, the pro se applicant should be given the benefit of the doubt, you will. Their testimony should be construed. Ms. Manning, my problem with that is the one that I just told you about, is that I think actually in a fair number of these cases, the petitioner would be better off without the representation that he gets. So, if we advantage the pro se person over him, that seems to me unfair. I think that depends on how you interpret the matter of WYC and its requirement about the sort of strict delineation of the particular social group. How strict is strict is a question that that case doesn't really answer. I think Your Honor certainly could touch on whether it is a stricter standard for someone who is well represented by counsel, or whether it's sort of one standard for what level of strictness is. I think Your Honor's point is well taken. But again, we... Well, what's the solution? I hear you. I think we agree on that. But do we still favor the pro se applicant? I think we do in terms of understanding what the facts are that they have put forward and what is the legal implication of those facts. I see Your Honor shaking your head. I guess I've seen in 25 years too many of these cases where the representation is so terrible that I honestly think that the person would be better off... Understood. I'm happy to go on. I'm a little bit over my time, but I'm happy to continue. I've taken up some of your time. You go ahead. No problem. My colleagues may have some questions. Well, I do want to say with regard to where Judge Marks is going on, it certainly is the instance that we see bad lawyers in cases. Of course, the issue here is really dealing with pro se. And the idea of the concept that perhaps if you're pro se, you're better off, maybe that's not so foreign to us when we think about Anders' cases with which an Anders brief would be submitted and no one has really brought up anything and the court has a duty to then comb through the record. And to some extent, that's really kind of better than being representative because you're not limited to those things brought up by the counsel. But in this instance, it really comes down to, it goes back to the constitutional versus legal era aspect of it and the duty of the IJ. So ponder that a little bit when you are thinking about the answers on return because I think this is a very critical question here. In terms of the pro se litigant as opposed to one who is represented because even knowing what a particular social group, that's hard for lawyers and it's hard for judges, much less someone who barely speaks English and has a limited understanding. So there are certain duties that I think that an IJ probably does have, but just think about that. Yes, sir. Thank you. Thank you. Maybe we can hear from the government then. Ms. Lee? Yes, please, the court. Oh, there goes the time. Jenny Lee on behalf of the respondent, the attorney general of the United States. The court should deny the petitioner for review because substantial evidence supports the agency's denial of petitioner's applications for withholding and cap protection. First, I'm going to jump into the question that the court has asked a lot of petitioner's counsel about with regard to the immigration judge's duty. The question is, did the immigration judge do her duty in this case? And the answer is yes. She did everything that petitioner's counsel was asking that she do. She asked questions, she listened to his testimony, and she developed the record. She asked follow-up question after follow-up question after follow-up question to figure out what was his fear? Who did he fear? And the advocates group and petitioner's counsel think that the immigration judge needed to ask further questions about particularity and social distinction. But in this case, the testimony, petitioner's testimony, and the objective evidence was very clear that he was a current member of a gang. So once we know that that group is not immutable, there's no need for the immigration judge to continue and ask further questions about particularity and social distinction. Counsel, I'm not so sure it is so clear that his testimony was that he was a current member of the gang. And I wondered if you accept, for purposes of appellate review, that the IJ found the petitioner credible. So, although, yes, the government accepts that the petitioner was credible for the court's review. The board assumed that the petitioner was credible. But even if an alien is credible, under the burden of proof statute, the petitioner would still have to show that his testimony was credible, persuasive, and supported by specific facts. In addition, the immigration judge, in determining the burden of proof, is allowed to look at the objective evidence. And I understand that, but go back to credible. What else has to be done? I thought credibility was one thing. Okay, there can be other evidence in the record. But you say that there's some further showing that would somehow, gathered from your answer, lessen the force of the credibility holding? Yes, Your Honor. So, if we go to the burden of proof statute at 8 U.S.C. 1229 A.C. 4, A.C. 4B, Sustaining the Burden of Proof, about midway in the paragraph, it says that, in evaluating the testimony of the applicant, are there witnesses in support of the application? We can't hear you, I don't think. I can't, anyway. I can't hear you, you have to talk louder. Oh, I apologize. I feel like I'm talking loud enough. Can you hear me now? So, on 8 U.S.C. 1229 A.C. 4B, which is the burden, the Sustaining the Burden statute, it indicates that the immigration judge will determine whether or not the testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant has satisfied the applicant's burden of proof. In determining whether the applicant has met such burden, the immigration judge shall weigh the credible testimony along with other evidence of record. Now, having said that, let's look at the record in this case. The petitioner never said that he was a former member. He said that he was leaving. If we look at the record, in his asylum application, he indicates, I was a part of them back in my country. But let's look at his testimony and the timeline. On the record at 170, he said he was, quote, considered a member, end of quote, starting in September of 2012. At 171 to 172, he said that he wanted to leave the gang, and then they threatened him and they beat him for a minute. And he also said at the end of September of 2012, a man from prison calls him. But then what happened afterwards? Around the end of 2012 and June 1st of 2013 when he left, he had no more problems with the gang because he did everything the gang told him to do, which was exactly what he was doing before he was threatened by the gang. So in the gang's mind, he was still a member. Now, let's go on to his other testimony. Going to 184, question, did you ever tell them you had left the gang? His answer, never. Question, so is it fair to say that officially at the day and point in time you left El Salvador, you were still an official member of MS-13? Well, maybe you might think that. Next question. 184, when did you stop being an official member of MS-13? Well, I decided when I left the country, I left the country, I decided to leave the gang completely. Absolutely. Then the next question on 185, did you ever tell the gang? His answer was no. Then couple this with his testimony about his friends in the United States. He testified that he did not know any MS-13 members in the United States, but he conceded, quote, the friends that I hung out with, well, all of them, I didn't know if they wanted this or that. This is at 186. And at 187, he added that when he had no money and was homeless, quote, I went and these people that I thought were friends and I thought they didn't belong to anything, so I give them my friendship and at the end of the day, they involve me in all of that. So let me ask the question to you where you're going with this. It seems as though you are arguing that in order to be able to indicate you left the gang, you have to have directly confronted them and told MS-13 you want to leave the gang. But the record does show he had indicated that he wanted to leave. He, in fact, did leave and that as a result of that, there's testimony that they considered him to be a deserter and went after this, all kinds of information on that. So are you saying that a person has to state unequivocally that they informed the particular group they want to leave in order to be able to obtain this benefit of saying that they are seeking to threaten him because of his indication? No, your honor, that would not make any sense. But in this case... That's what I thought. On this case and on this record based on his activities in the United States and his own testimony about his friends, and then let's go to the objective evidence. This is a record of an invisible alien indicated that he was, quote, a suspected MS-13 gang associate. Petitioner, in this case, was arrested with three other people in a vacant apartment by Prince George County's Police Department. And they suspected... They actually had him  and a detective specifically confirmed through a past proven reliable source of information that Reverend Contreras, Miguel, and another person that he was arrested with at that apartment are active gang associates of MS-13. So with all of that, does the record reflect, and I don't seem to find it anywhere, that the immigration judge ever explained to him what a particular social group is? The immigration judge did not explain to him what a particular social group is, but she asked... Did she ever even mention the concept of what it is? Your Honor, the immigration judge did not have to because through her questions she asked him, what were you afraid of? Why were you afraid of leaving? What happened? Based on... But you don't think she has a duty to tell him or explain what a particular social group is? This is why they're leaving if they're in fear for their life. You don't have to... But don't you recognize a particular social group is a work of art? Before I did these cases, I didn't know what it meant. It is a legal term of art, but even though the term is a legal art, the concept should be simple. For example, if I was a transgender person coming from another country, I can say, this is why I'm afraid. And, you know, it's very clear that that was the basis of her fear. So what we're asking aliens, especially in the pro se context, is to tell us why they were afraid to go back to their country. An immigration judge in the pro se context is to compare those fears that they articulate with the legal standards. And that is exactly what the immigration judge did here. And if you... If we talk about numbers, as according to Track Immigration, there are over 1.27 million pending immigration cases in this country. And I'm not exactly sure what the number relates to detention facilities, but between 2000 and 2017, only about 10 to 30% of those aliens were represented in the detention facilities. So what we're asked, what Petitioners Council and the advocates group is asking for is that if you are pro se, then the immigration judges somehow have to further develop the record because the government's position here is that the immigration judge did exactly what she was supposed to do. She developed the record. And in about five, 10 minutes, how that record was developed. So if you look at the record, the substantial evidence indicates that he was a current gang member who was threatened for trying to leave. Now, if the evidence indicates that he left because he was no longer there and so somehow from that we get former, that's not the standard simply because we can have two conclusions from the evidence. That does not mean that the agency's decision is not supported by substantial evidence. But he was found credible. Yes. You don't dispute that. You really can't dispute it. I don't dispute that. And I don't dispute that. In fact, in the immigration judge's determination, the alternative, like first determination was that he was not credible and the alternative determination was on his particular social group. She said, even if some of respondents' testimony were taken as credible and it were believed that he was threatened for wanting to leave the gang, he explained he never told gang members he was leaving and simply left for the United States. Counsel, that's why I asked you if you accepted that the IJ was found incredible. Yes. Not partly credible, credible. Yes, the immigration judge found that his testimony when part of it was in the alternative determination, he found that his testimony was credible. And again, we have to go look at the burden, the burden statute, which says we have to look at all of the evidence, which is what the immigration judge did in this case. And then moving on to the final point, which is how his protection, his application for protection under the Convention Against Torture, the applicant has a duty to demonstrate a clear probability that he'll be tortured. Before you, before you go to that, I want to, I want to at least make sure I'm clear in terms of your view on the pro se applicant. And I know you stated in your brief and it seems to have been Judge Marks that asked the question of your opposing counsel, but is it your position that basically the immigration judge doesn't have to do anything to help the pro se because the burden of proof is on him to do this, on the applicant? Is that your position? No, Your Honor. The immigration judge's duty is to develop the record, which is what she did in this case. And to develop the record, if you have a pro se applicant, you have to ask them follow-up questions. Why are you, why are you afraid to look at the document and ask follow-up questions? So maybe that goes into the question then is, what do you mean by help them develop the record? I mean, you do state in your brief that they're not to be advocates, but how is this different? Do you view it to be somewhat of a different duty when you have a pro se applicant? As has been the case in federal court, we are asked to liberally construe pro se complaints. In Social Security type cases, the ALJs are asked to, I guess the word would be help, the applicants who are pro se in a matter. And here, as Judge Motz has alluded to, defining what a particular social group is not, is more of a term, a legal term. I mean, it's a difficult concept. And yet, I think you indicated to me that she didn't have a duty to tell them what that is, what a particular social group is. Is that your position? My position is that the immigration judge does not have a duty to create the applicant's claim for him. So, in this case... That's not my question, though. I would have asked that question. That sounds like a good question. My question is, did she have a duty under this situation to explain or at least what a personal, what a particular social group is? I didn't... I mean, that's an interesting question about creating a record, but that's not what I asked. So, answer that question, if you will. The immigration judge does not have a... does not have a duty to explain what a particular social group is. Okay, then I got your answer. Instead, what the immigration judge's duty is is to develop the record and match it with the past, which is exactly what she's done in this case. Let's just pursue that a minute. So, she's developing the record and part of the record is determining what the claims are. And so, is she, or is the IJ to say, do you claim to be in a particular social group? Is that what she's supposed to say? No, that would be that would be a legal term of art and so the alien might not know what that means. Right. So, how would she develop that record? So, what she says is why are you afraid to go back to your country? Who are you afraid of? Well, maybe this case comes down to whether the IJ fulfilled her duty to develop the record because you feel there is a duty to develop the record, right? Ma'am? Yes, Your Honor. Yes, the immigration judge does have a duty to develop the record. Okay. So, moving on to the Convention Against Torture, an applicant for cap protection has the duty to demonstrate a clear probability that he will be  government acquiescence and you can't do that with just evidence of general country conditions. Nothing in his application or his testimony indicated that he had a particular threat from vigilante groups or from the Salvadoran authorities. If you look at his application, the question is are you afraid that you'd be subjected to torture in your home country? If yes, explain why you're afraid. The answer was El Salvador, but the only thing I have in life is still back in there. My mom and dad as a human being, I miss them a lot. Again, there's nothing about vigilante groups or authorities. Now, let's look at his testimony. The immigration judge asked, when you lived in El Salvador, did you ever have any problems with the police or other government authorities? His answer was yes. I did have a problem and he explained, well, I did have a problem with the authorities  because they caught me with a motorcycle that belonged to them and at 177, he explains that he was in prison for three days and released because he was considered a student and then the immigration judge said, is there anything else you wanted to tell me about any other encounters you had with the police or other authorities? His answer was, that's the only problem I had when I was in El Salvador. Other than that, I have no other problem. So, his own testimony does not claim that he had fears from the authorities or that he feared torture from the authorities or vigilante groups. Now, compare that with us. So, do this. Let me point you to at least something I think would be important if you discuss it with me and with the court. We have a case, Rodriguez-Arias versus Whitaker. Are you familiar with this case, of course? I'm very familiar with it, your honor. Tell me, why does that go against your argument here with regard to this particular case? Yes, your honor. In Rodriguez-Arias, the petition on that case specifically testified that because of his gang, that he expected to be targeted by violent gangs and by vigilante groups and by the police. In addition, he provided expert witnesses about how gang members or suspected gang members routinely experience extreme violence in El Salvador at the hands of other gangs, numerous vigilante groups, and police forces. In this case, we just don't have that type of evidence. So, again, under the substantial evidence record, you look to see where does the evidence fall. And here, the evidence, the substantial evidence supports the agency's conclusion that he did not have, that he failed to show a clear probability of torture in El Salvador. And since I have a little bit of time, I wanted to talk about his particular social group with regard to his family. Judiciary Counsel mentioned that in his asylum application, he indicated that he mentioned his cousin a lot. Well, let's look at that question. And this is at page 347 of the record. The question is, have you, your family, or close friends or colleagues, ever experienced harm or mistreatment or threats in the past by anyone? That does not ask, why are you afraid? Which would be, if he's saying that he belongs to a particular social group consisting of his cousin, the question would be, why? Then, let's look at his testimony. When he testified, he said that he was threatened with his cousin and that they killed him, but he didn't say that that was the reason. I see my time is up, and with that, I thank the court for its time, and I rest on the government's feet. Thank you. Thank you. Ms. Manning, do you have a rebuttal? Yes, Your Honor. Just a few points, if I may. First, on this question that my colleague addressed about whether, my client made it clear, in the room, in the hearing, whether he was seeking protection because he had left the gang without permission. I think it was crystal clear, I think the application shows that, but the way we know it was clear is because that's the issue that the government  trying to address. The government attorney says, and I quote, there's not a clear probability that if he returned to El Salvador, he would suffer persecution on account of being a former gang member, since the government's position is he's a current gang member. The government is arguing that he's not actually a former gang member, but the government is also acknowledging that the whole point that my client is making, the reason he's seeking protection is because he's a former gang member who left without permission. So given that government acknowledgment, I honestly don't think there can be any serious doubt that he at least put forward enough information to put everyone on notice of the nature of his claim in that sense. Mr. Manning, can you tell me whether there was more than one source of potential torture, and if there was, did the immigration judge aggregate that testimony? No, your honor, I don't think that the immigration judge aggregated the testimony as required by the opinion you authored in Rodriguez areas. First of all, is there more than one source of future torture in your mind? Yes, I believe there is. So, the country conditions evidence explains in some detail how rival gang members will prey on, certainly their rival gangs, but particularly former gang members who no longer have the protection of the gang, frankly. There is extensive evidence of extrajudicial killings of gang members and former gang members by the police. There is  vigilante death squads in El Salvador. None of that is addressed in any way in the IJ's decision, and frankly, given that the decision was issued a day after the hearing, not at all clear that that was actually genuinely considered. Now, it is correct that my client didn't identify, you know, say, I'm afraid of being tortured by rival gangs, the police, and vigilante death squads, but there is not a subjective component to cat protection. He doesn't need to say that he is subjectively afraid of particular gangs if the evidence shows that there is, in fact, an appropriate claim based on those other sources of risk. Did the IJ consider country conditions at all? It does not appear that she well, I should take that back. There is a brief mention of country conditions. Again, it was opinions issued a day later after it was first entered in evidence, so not clear that she actually considered it in any significant way at all. If I may address Judge Wynn's question earlier, in terms of the source of the duty to ensure that pro se applicants if I may put it colloquially will have a fair shot. There is, I believe, a statutory component to that duty. There is absolutely also a due process component to that duty. It has been recognized that the Fifth Amendment due process requires that removal hearings be fundamentally fair. That is, among other places, the Supreme Court's Flores decision, 507 U.S. 306. It cannot be fundamentally fair if the I.J. and the DHS attorney are well aware of the various legal complexities and the terms of art, including particular social group, what the tests are, what the requirements are, and the requirements of a particular social group, much less what that meant in any level of detail at all. So he simply has to be asked the questions. That duty of the I.J. to make sure that the hearing is fundamentally fair requires a level of follow-up that we did not see here. Well, is that duty greater than the I.J.'s statutory duty to develop the record? I think the due process component is yes, because, you know, when an individual I'm sorry, when would you have a situation where the I.J. had sufficiently developed the record, but there was still a fundamentally unfair and therefore constitutional value in your view? I'm afraid I'd have to think about it. I think there could be any number of possibilities, frankly. So does this only happen if you have a pro se? No, absolutely not. If that's so, are we judging the quality of the representation that the person is getting? So if you have a good lawyer, we hold you to one standard, and if you have a bad lawyer, or you are a pro se, you get a benefit of a better standard? I think either way, the hearing has to be fundamentally fair, that sort of due process minimum of fundamental fairness. If the hearing is not due enough to make the hearing fundamentally fair, the IJ has that duty regardless of what the attorney is or is not doing. I think we will assume, and I think very reasonably assume, that in pro se cases, a good amount of the time the IJ is going to have to do more work, certainly, than they would have to do if the applicant is represented by competent counsel. Let me ask you this, in this case, the case we have in front of us, if the IJ had performed the duty and fully developed the record, as you say, the IJ must, would there be something else the IJ had to do because of the Constitution? I think in terms of the issue, if I'm understanding your question correctly, I think once the IJ ensures that the record is adequately developed, that is, if there is enough information from which both the BIA and this court could judge whether there is, in this case, a particular social group based on what the client is actually claiming, not this other imposed social group. But if there is enough there to assess that in all of its various forms,  there would be other duties. For example, the IJ's duty to actually address each and every issue, there's no discussion really of particular social group. There's a footnote that kind of alludes to it but doesn't really address the issues, doesn't analyze it in any way, and there's sort of nothing to work with on appeal. That too, you know, is something the IJ would need to do, that's both statutory, it would be an abuse of discretion, and at some point you could get so poor that there would also be this fundamental fairness issue. Thank you. Thank you, Your Honor. The case is submitted. Do my colleagues have any further questions? No further questions. No. Thank you very much, counsel. We appreciate your argument. Ms. Manning, are you court appointed? No, ma'am, we are not. We are pro bono, but we are not court appointed. Thank you.
judges: Diana Gribbon Motz, James A. Wynn Jr., Henry F. Floyd